## Sharman v. Nagle

*Kenneth C. Myers,* for plaintiff.
*Dennis L. O'Connell,* for defendant.

GRIM, *J.,* July 2, 1991—This is an action for a declaratory judgment whereby plaintiff seeks a determination by the court that a valid marriage does not exist between the parties. The following is the procedural history.

On November 10, 1987, defendant Barbara S. Sharman filed a complaint in divorce. On January 7, 1988, plaintiff Henry R. Sharman filed an answer to the divorce complaint and a complaint for declaratory judgment under section 206 of Divorce Code. In his complaint Henry avers that he was married to another woman from March 6, 1943, until March 3, 1969, at which time he was divorced by a Pennsylvania decree. Although Barbara avers in her divorce complaint that the parties were married in July 1967, in Juarez, Mexico, after Henry had obtained a Mexican divorce from his former wife a few days earlier, Henry contends that the Mexican divorce was invalid and that the parties' cohabitation was meretricious.

Barbara filed an answer to Henry's complaint for declaratory judgment stating that she believed that the Mexican divorce and their subsequent marriage in Mexico were lawful and that Henry had told her that the divorce decree was valid. Additionally, she

argued that the impediment to the parties' marriage, Henry's prior existing marriage, had been removed when he was divorced by the Pennsylvania decree on March 3, 1969.

Both parties filed a motion for summary judgment. They agreed to submit the issues on memoranda and Henry's deposition. The court granted summary judgment for Barbara. Henry appealed. The Superior Court reversed and remanded the matter for further proceedings. This court then presided over a trial which produced a voluminous record comprised of lengthy testimony and 47 exhibits. The following are the relevant facts.

Barbara met Henry on a skiing trip in early 1964. Barbara testified that she knew that Henry was married to the former Miriam D. at that time, but that he told her that the marriage was strained due to Miriam's mental problems. A sexual relationship between the parties ensued. Miriam was subsequently committed to a state mental institution, Wernersville State Hospital. In late summer or early fall of 1965 Henry asked Barbara to live with him at his residence to help care for his and Miriam's two adopted sons. Both sons never saw Miriam again after 1965.

Barbara testified that Henry informed her that he did not expect Miriam to improve psychologically. It is undisputed that Henry wanted a divorce from Miriam and that the parties realized that a Pennsylvania divorce would be hard to obtain due to Miriam's condition. Barbara contends that Henry wanted a divorce so that he could marry her. Henry denies that this was his reason.

Barbara became pregnant in January 1967, and eventually gave birth to the parties' daughter, Wendy Sharman, on October 2, 1967. After Barbara became pregnant, Henry contacted a local attorney

to make the necessary arrangements for him to obtain a divorce from Miriam in Mexico. A Mexican attorney, Eugenio Calzada, Esq., proceeded with the divorce proceedings in Mexico. Henry travelled to Mexico twice. The first time he went without Barbara. The second time Barbara accompanied Henry. She claims that she did so in order to marry Henry after the divorce was granted and to go on a honeymoon in Acapulco, Mexico.

Henry denies that Barbara accompanied him in order to marry him. Instead, he claims she went along for a vacation.

Henry's sons were teenagers when the parties went to Mexico. They testified that they did not know why the parties travelled to Mexico but they had assumed it was for a vacation.

The parties arrived in Ciudad Juarez on or about July 1, 1967. Henry met with Mr. Calzada concerning his divorce, and the divorce was entered on July 1, 1967. The divorce decree was in Spanish and later translated into English.

On July 6, 1967, the parties underwent a marriage ceremony which was primarily conducted in Spanish. Mr. Calzada was one of the witnesses, but none of the witnesses knew the parties for the required length of time. The parties later received translations.

Barbara testified that both parties entered into the ceremony with the specific intent of marrying each other, believing that they were free to do so. Although the wedding ceremony was partially in Spanish, Barbara claims that both parties fully understood that they were married to each other.

Henry denies the purposes of these proceedings. He submits that the parties went to Ciudad Juarez to force Miriam to give him a divorce and to forestall criminal actions which were being threatened by

Miriam against them. He claims that they went through a marriage ceremony in order to appease Barbara's sensibilities regarding the pending birth of their daughter.

Henry argues that the marriage ceremony was invalid because the witnesses did not know the parties. Barbara testified that she had no knowledge of Mexican law so she relied on their attorney's advice and believed that everything was legal.

Approximately one month prior to the parties' trip to Mexico, Barbara claims that Henry bought her a wedding ring which she began wearing immediately following the ceremony. Henry denies that he bought Barbara a wedding ring. He maintains that she selected a ring without his participation and that he just paid the bill when it arrived. Barbara, however, presented a receipt for a wedding ring from a jeweler made out to Henry and indicating that it was a cash transaction. (Exh. 44.) The court viewed the ring and it definitely looked like a wedding ring.

Ever since the wedding on July 6, 1967, Barbara has used the surname Sharman. Henry acknowledges this. Henry asserts that he did not care what she called herself so he allowed her to use the surname Sharman.

Henry's son, John Scott Sharman, is presently 40 years old. He testified that neither of the parties had told him that they were married and that he had never looked at Barbara's hand to note if she wore a wedding ring. He and his brother admit that they knew Barbara introduced herself as Mrs. Henry Sharman, but they claim that Henry introduced Barbara only as Barbara. Wendy, the daughter of the parties, however, recalled several instances where Henry introduced Barbara as his wife in her presence. Henry rebutted this testimony by saying

that if he did so it was only to avoid embarrassing Barbara and Wendy by stating their true relationships to him.

On August 29, 1967, after the parties had returned to Pennsylvania, Miriam filed criminal charges against both parties, accusing husband of adultery and bastardy and Barbara of fornication. Henry contacted an attorney to represent the parties in those proceedings. Barbara testified that she did not recall all of the facts surrounding the charges. She knew that Henry did not attach too much importance to the actions so she did not either.

On September 11, 1968, Miriam, acting through her attorney and her parents, executed a comprehensive property settlement agreement with Henry. In November 1968, as part of the resolution of the criminal actions, Miriam instituted an action in divorce against Henry in Berks County, Pennsylvania, which resulted in the entry of a Pennsylvania divorce decree between herself and Henry on March 3, 1969 ("Pennsylvania divorce").

On February 4, 1969, a hearing was held before a master in divorce. Both Miriam and Henry were represented by attorneys at the hearing, but only Miriam and her father testified.

The report of the master was admitted. Miriam testified that she knew Henry had introduced Barbara as his wife. (Master's report at 5.) Miriam's father also testified that he knew Henry had done this. (Master's report at 7.)

Barbara asserted that she only had found out about the Pennsylvania divorce after the divorce decree had been entered. She never had any doubts about the validity of her own marriage to Henry and attributed the procuring of the Pennsylvania divorce to Miriam's history of mental illness.

John Sharman testified that he had never thought about Henry's divorce from his ·mother, Miriam, and had found out when it occurred approximately two to three years ago. He, furthermore, testified that he saw mail come to their residence occupied by him, his brother, Henry and Barbara addressed to "Mr. and Mrs. Sharman." When he was away from home he in turn sent letters addressed to Mr. and Mrs. Henry Sharman.

Henry's younger son, H. Robert Sharman, is 38 years old. He did not believe that the parties were married, but he admitted that he nevertheless referred to wife as Barbara Sharman and when he wrote home he addressed the correspondence to "The Sharman Family."

Henry produced just his two sons in addition to himself to support his position that he was never married to Barbara. Wendy, the parties' former minister, and two attorneys testified on behalf of Barbara. All of Barbara's witnesses knew the couple and believed that they were married. Wendy never had any doubts that her parents were married. The first time that she knew that marriage was an issue was when husband initiated the instant proceeding. Wendy recalled cards from Henry addressed to her mother as his wife.

Wendy's certificate of baptism (exh. 8) was signed by the Reverend Harold C. Hollinger and states that she is the daughter of Henry R. Sharman and his wife, Barbara S. Sharman. Pastor Hollinger testified that neither party ever informed him that they were not married. He had baptized children whose parents were not married and in those instances he had used a different certificate of baptism. He did know, however, that Henry had difficulties in obtaining a divorce from Miriam.

In addition to the testimony of various witnesses, Barbara introduced into evidence an extensive list of exhibits which document the fact that she was referred to as Henry's wife. These exhibits include: a trust agreement dated July 29, 1969; Reliance Insurance Company policy change dated January 13, 1972; deeds dated October 3, 1972, and October 31, 1972; loan agreements with National Central Bank dated May 6, 1975, and June 22, 1976; Henry's last will and testament and agreement of trust dated October 15, 1986; income tax returns from 1969 until 1986; Henry's continuing designation of Barbara as his wife for purposes of health insurance.

Henry explained that he referenced Barbara Sharman as his wife on these documents for tax or other financial reasons, such as savings on income tax, avoiding estate, inheritance, and real estate transfer taxes, and preserving his home for his children.

The attorney who drafted Henry's will testified that he believed that the parties were married and for that reason referred to Barbara Sharman as Henry Sharman's wife. Neither party informed him that a marital relationship did not exist between them.

The Pennsylvania Divorce Code has been amended since the filing of this action. The court will, however, refer to the statutes which were in existence at the time this action commenced.

Title 23 P.S. §206 provided:

"When the validity of any marriage shall be denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage, and, upon due proof of the validity or invalidity thereof, it shall be declared valid or invalid by decree of such court, and, unless

reversed upon appeal, such declaration shall be conclusive upon all persons concerned.''

The court finds that husband should be estopped from attacking the validity of the Mexican divorce because it is inequitable for him to do so. Estoppel requires a consideration of all of the circumstances surrounding not only the procurement of the divorce, but also the conduct of the parties thereafter and the effect of a declaration of the invalidity of the divorce on others. In determining whether estoppel is applicable, factors considered have included the parties, the effect of the decision on other individuals, the nature of the rights sought to be vindicated, public policy, and prior judicial declarations. *Lowenschuss v. Lowenschuss,* 396 Pa. Super. 531, 579 A.2d 377 (1990).

The parties, despite husband's assertions, presented themselves as husband and wife to the world after the marriage ceremony in Mexico; the public acknowledged them as a married couple. The parties travelled together and socialized together. They introduced each other as spouses. They raised a daughter together and that daughter believed that her parents were married. To deny the validity of this marriage would bastardize their daughter more than 20 years after her birth.

From the time of their marriage ceremony in Mexico, the parties filed joint income tax returns. In 1986 husband executed a will and a trust instrument naming Barbara Sharman as his wife. In 1972 husband executed a deed naming Barbara Sharman as his wife. Loans were applied for and received by the parties as husband and wife. Husband provided insurance to Barbara Sharman as his wife. The parties owned bank accounts as husband and wife.

That others viewed the parties as husband and wife is amply documented in the record. The pastor

and the members of the church to which the parties belong believe that the parties are married. Newspapers referred to them as husband and wife. The court finds it beyond belief that all of the preparers of the legal documents either told husband to lie about his marital status or allowed themselves to be a party to that lie.

Husband was content to be married to wife until wife initiated a divorce proceeding. Only when the marital status became a certain detriment to his financial state did he renounce the relationship. Husband and his sons presented the only evidence that husband's relationship with wife is meretricious. This evidence is self-serving. Husband has been hoisted on his own petard.

Husband was married when it suited his financial and personal interests to be married. Now that there is no longer an economic advantage in being married to wife, husband wants to disavow the relationship. Husband has already enjoyed the financial rewards of marriage; now he must tolerate the economic burdens of dissolving that marriage.

Husband argues that *Lowenschuss* does not apply because the case sub judice predates the *Lowenschuss* decision. The court does not think that this is a bar to its application. Assuming arguendo that it is, the court still finds that a valid marriage exists under 23 P.S. §204 (a)(1), which reads in pertinent part as follows:

"(a) Where there has been no confirmation of cohabitation following the removal of an impediment, the supposed or alleged marriage of any person shall be deemed void in the following cases:

"(1) Where either party at the time of such marriage had an existing spouse and the former marriage had not been annulled nor had there been a divorce. . ."

The initial crucial issue is what was the parties' intent when they entered into the marriage ceremony in Mexico on July 6, 1967. Wife alleges that she believed that husband's Mexican divorce from Miriam Sharman was valid and that their subsequent marriage was legal. Husband, however, contends that wife knew that the Mexican divorce was invalid and was obtained in an effort to force Miriam to get a divorce and that the subsequent marriage ceremony between the parties was just an attempt to indulge wife "on the eve of impending birth."

Thus, this material fact is disputed. "Where there is conflicting testimony . . . the decision of what testimony to believe must be left to the trial judge who had the opportunity to observe the demeanor of the witnesses and actually hear the testimony." *Nancy E.M. v. Kenneth D.M.,* 316 Pa. Super. 351, 462 A.2d 1386 (1983). The court resolves this issue in wife's favor for the following reasons.

A wedding ring was bought and, if nothing else, paid for by husband prior to the trip to Mexico. Husband made the arrangements for a Mexican divorce and a Mexican marriage ceremony. The court finds it incredible that wife would participate in a marriage ceremony which she knew was worthless. If wife knew that the ceremony lacked validity, then how could it "indulge her sensibilities on the eve of impending birth," as husband claims it did?

The court finds husband's sons' testimony implausible and contradictory. These children are grown men. John Sharman maintains that he never looked at wife's hands, so he did not know if she wore a wedding ring, even though he lived in the same household for eight years. He asserts that he did not believe that the parties were married, but yet he wrote to them as Mr. and Mrs. Henry Sharman. H. Robert Sharman states that the parties are not

married but refers to wife as Barbara Sharman and writes letters addressed to "The Sharman Family."

Thus, the court finds that the parties had the intent to marry. Assuming arguendo that husband knew that the marriage would be invalid, the court still finds that wife at least had the intent to be married to husband and that husband did nothing to distort her perception of the validity of the marriage.

The court further finds that if there was an impediment to the marriage due to husband's existing marriage to Miriam Sharman, the impediment was removed by the Pennsylvania divorce decree in 1969. There is no dispute that the parties continued to live together; therefore, there is confirmation of cohabitation, and the invalid marriage become valid. It does not matter if husband knew that the Mexican divorce was invalid, it is enough that wife believed that she was entering into a legal marriage. Whenever one or both parties enter a matrimonial relationship in good faith, ignorant of the impediment to a valid marriage, continued cohabitation after the impediment has been removed results in a valid marriage. *Dowd v. Dowd,* 275 Pa. Super. 472, 418 A.2d 1387 (1980).

In accordance with the foregoing opinion, the court enters the following

## DECREE

And now, July 2, 1991, the court finds that plaintiff, Henry R. Sharman, and defendant, Barbara S. Sharman, are legally married and that defendant is entitled to maintain proceedings for divorce and economic relief pursuant to the Divorce Code, as amended.